**ATTACHMENT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALISHEA KINGDOM, et al., | Case No. 1:25-cv-00691-RCL |
| Plaintiffs, | [~~PROPOSED~~] ORDER GRANTING |
| v. | **PLAINTIFFS' MOTION FOR RENEWED** |
| | **PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

This Court entered a preliminary injunction in this case on June 3, 2025. ECF No. 67 [*Kingdom v. Trump*, 2025 WL 1568238 (D.D.C. June 3, 2025)]. On August 20, 2025, the Court extended the injunction for 90 days, to run from September 1 to November 30, 2025, as required by the Prison Litigation Reform Act's ("PLRA") plain language. 18 U.S.C. § 3626(a)(2) (preliminary relief "shall automatically expire on the date that is 90 days after its entry unless the court . . . makes the order final before the expiration of the 90-day period."). *See* ECF No. 79 (extending the PI). On November 17, 2025, the Court extended the injunction for another 90 days, to run from December 1, 2025, to March 1, 2026. *See* ECF No. 96. On February 5, 2026 the Court extended the injunction for another 90 days, to run from March 2, 2026, to May 31, 2026. *See* ECF No. 114.

On February 19, 2026, BOP issued Program Statement 5260.01 (the "Program Statement"), ECF No. 125, which formed the basis of BOP's April 1, 2026 motion to dissolve the preliminary injunction, *see* ECF No. 160. Plaintiffs moved on April 10, 2026, to stay briefing on the motion to dissolve in order to allow Plaintiffs the opportunity to file a supplemental complaint and motion for an updated preliminary injunction addressing the Program Statement, ECF No. 166, which this Court granted on April 15, 2026, setting the briefing schedule requested by Plaintiffs, *see* ECF No.

1

**Add.1**

170. Plaintiffs filed a supplemental complaint and motion for updated preliminary injunction on April 29, 2026. ECF Nos. 178, 179. Defendants filed their opposition to Plaintiffs' motion for an updated preliminary injunction on May 13, 2026. ECF No. 186. Plaintiffs' motion for an updated preliminary injunction has not yet been decided.

On May 13, 2026, Plaintiffs moved the Court to renew this preliminary injunction for a period (not to exceed 90 days) beginning June 1, 2026, and ending fourteen calendar days after the Court's decisions with respect to the Pending Preliminary Injunction Motions. *See* ECF No. 188. Defendants oppose the motion. *Id.*

Although there are new factual circumstances in this case, as detailed in the Pending Preliminary Injunction Motions and Supplemental Complaint, *see* ECF Nos. 160, 178, 179, none necessitate a reassessment at this juncture of this Court's prior holding that the Plaintiffs have met their burden for preliminary injunctive relief or require a reevaluation of that relief pending disposition of the Pending Preliminary Injunction Motions. Further, it is in the interest of justice and judicial economy to briefly extend this preliminary injunction while the Court is deciding the pending motion for an updated preliminary injunction.

Furthermore, district courts—including this one—regularly renew or extend preliminary relief for additional periods under the Prison Litigation Reform Act while litigation on the merits of a case continue. *See* ECF Nos. 79, 96, 114; *Doe v. Blanche*, 172 F.4th 901, 912 (D.C. Cir. 2026) (noting BOP's agreement "that section 3626(a)(2) does not limit a district court's ability to issue a new preliminary injunction at the end of the ninety-day period set forth in that statute" and that "every court of appeals that has reached the issue agrees" (quotations omitted)); *Smith v. Edwards*, 88 F.4th 1119, 1125 (5th Cir. 2023) ("Though a preliminary injunction entered under the PLRA otherwise automatically expires ninety days after entry, the injunction may be extended by the

district court if it makes the requisite findings."); *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th

Cir. 2001) ("Nothing in the statute limits the number of times a court may enter preliminary

relief. … the provision simply imposes a burden on plaintiffs to continue to prove that preliminary

relief is warranted."); *see also Alloway v. Hodge*, 72 F.App'x 812, 817 (10th Cir. 2003)

(unpublished) (renewal of preliminary injunction that expired under the PLRA is not an abuse of

discretion).

Therefore, upon consideration of Plaintiffs' Motion for Renewed Preliminary Injunction,

ECF No. 188, it is **ORDERED** that Plaintiffs' Motion is **GRANTED**; and it is further

**ORDERED** that the Defendants are enjoined from implementing Section 4(c) of Executive

Order 14168 against any class member in this action, as defined at ECF No. 67 at 27, for a period

(not to exceed 90 days) beginning June 1, 2026 and ending fourteen calendar days following this

Court's resolution of Plaintiffs' pending Motion for an Updated Preliminary Injunction; and it is

further

**ORDERED** that BOP is required to restore and maintain access to those treatment

modalities for those who previously received them pursuant to a prescription rendered by BOP

staff. If BOP medical personnel subsequently determine that an existing or future class member is

in need of either or both of these treatment modalities, the BOP may not take those treatment

options off the table while this dispute is pending.

In accordance with the Prison Litigation Reform Act, the Court finds that this preliminary

injunction is narrowly drawn, extends no further than necessary to correct the harm that the Court

finds requires preliminary relief, and is the least intrusive means necessary to correct that harm.

18 U.S.C. § 3626(a)(2). The Plaintiffs and the certified class have shown a substantial likelihood

of success on their claims that Defendants' ban on gender-affirming healthcare and implementation

of Section 4(c) of the Executive Order as to them would be unlawful and is causing or will cause them immediate, irreparable harm. Because applying BOP's ban on gender-affirming healthcare and Section 4(c) to the Plaintiffs and the certified class would cause this serious and irreparable harm, a preliminary injunction is necessary to correct the harm and is the least intrusive means to do so. Furthermore, because this preliminary injunction only prevents the implementation of those sections of the Executive Order for which Plaintiffs have demonstrated a likelihood of success on the merits and irreparable harm, this injunction extends no further than necessary to correct the harm. Finally, this Court has considered any adverse impact on public safety or on the operation of the criminal justice system caused by this relief and has given substantial weight to such impacts. After this consideration, the Court concludes and finds that no adverse impact on public safety or the operation of the criminal justice system will result from maintaining the status quo while this litigation proceeds.

**IT IS SO ORDERED**.

Dated: _____ May 26 _____, 2026

_____
Hon. Royce C. Lamberth
United States District Judge

4
**Add.4**

**ATTACHMENT B**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALISHEA KINGDOM**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:25-cv-691-RCL** |
| **DONALD J. TRUMP**, *et al.*, | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION**</u>

The plaintiffs in this dispute are inmates in the custody of the Bureau of Prisons ("BOP") who have been medically diagnosed with gender dysphoria. During their periods of incarceration, the BOP has provided the plaintiffs with "social accommodations," such as clothing and hair removal devices, as well as hormone therapy (collectively "gender-affirming care"), to mitigate the negative psychological effects of their conditions. On January 20, President Trump issued an Executive Order which provides that federal funds shall not spent on any medical treatment for the purpose of conforming an inmate's appearance to that of the opposite sex. The BOP subsequently promulgated two implementing memoranda to guide the agency's execution of the Executive Order's commands. The plaintiffs' access to hormone medications and social accommodations was subsequently cut off or reduced. Access to hormone medications has since been restored, but the plaintiffs remain unable to procure social accommodations.

The plaintiffs, on behalf of a putative class of BOP inmates diagnosed with gender dysphoria, have moved to certify their proposed class and to preliminarily enjoin the implementation of the Executive Order and the implementing memoranda while this litigation is

pending.  For the reasons that follow, both the plaintiffs' Motion to Certify a Class and their Motion for a Preliminary Injunction will be **GRANTED**.

## I.    BACKGROUND

On January 20, 2025, President Donald Trump signed an Executive Order which provides, in pertinent part:

> Sec. 4(c): "The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."
> . . .
>
> Sec. 8(b): "This order shall be implemented consistent with applicable law and subject to the availability of appropriations."

Exec. Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order").  Pursuant to the directions contained in Section 4(c), the Bureau of Prisons began the process of formulating a policy consistent with the Executive Order.  On February 21, 2025, the Bureau of Prisons issued an implementing memorandum (the "First Implementing Memorandum") which, in relevant part, provides that "[n]o appropriated funds should be utilized to purchase any items that align with transgender ideology (e.g., binders, stand-to-pee devices, hair removal devices, etc.)" and that "[r]equests for clothing accommodations (e.g., issuance of smocks for male inmates and undergarments that do not align with an inmate's biological sex) will not be issued.  Additionally, . . . previously purchased commissary items by inmates may remain in their possession."  First Implementing Memorandum, Compl. Ex. A, ECF No. 1-1.  On February 28, 2025, the BOP issued another implementing memorandum (the "Second Implementing Memorandum") providing that "Consistent with Executive Order (EO) 14168, . . . no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of

conforming an inmate's appearance to that of the opposite sex.  This policy is to be implemented in a manner consistent with applicable law including the Eighth Amendment."  Second Implementing Memorandum, Compl. Ex. 2, ECF No. 1-2.

The three named plaintiffs in this case—transgender inmates who were diagnosed with gender dysphoria by BOP medical staff, were in BOP custody at the time that the Executive Order and implementing memoranda were issued, and who remain in BOP custody today—initiated this action on March 7, 2025.  Compl. ¶¶ 1, 4, 24–26, ECF No. 1.

To be "transgender" is to feel that one is a member of a particular gender that is different from one's sex assigned at birth.  *See* Declaration of Dr. Dan H. Karasic ("Karasic Decl.") ¶¶ 32, 36, 42, ECF No. 7-2.  Both gender identity and sex assigned at birth have biological causes; for example, sex assigned at birth depends on factors such as a person's genital appearance, assortment of chromosomes, and endogenous hormones.  *Id.* ¶¶ 33, 38.  Gender identity may also be influenced in part by external factors.  *Cf. id.* at ¶ 38 ("Gender identity, which has biological bases . . . is not merely a product of external influence . . . .").  "Gender dysphoria" is a medical condition wherein a person's incongruence between their sex and their gender identity causes "clinically significant distress and social/occupational impairment."  *Id.* ¶¶ 45, 47.  "When untreated, gender dysphoria can cause significant distress including increased risk of depression, anxiety, self-harm and suicidality.  It can also impair individuals' ability to function in all aspects of life . . . ."  *Id.* ¶ 51.  The parties agree that gender dysphoria exists and that it can have serious manifestations.  The parties also agree that hormone therapy is an important method for the treatment of gender dysphoria, although not every gender dysphoric person requires hormone therapy.  *See id.* ¶ 66 ("While social transition alone can adequately address gender dysphoria for some people, many individuals with gender dysphoria cannot obtain relief without also receiving medical interventions

3

**Add.7**

to align the body with their gender identity."); Declaration of Chris A. Bina ("Bina Decl.") ¶ 24, Defs.' Opp'n Ex. 1, ECF No. 36-1 (describing the plaintiffs' hormone therapy treatment regimens as "medically necessary care").

Plaintiff Alishea Kingdom is a transgender woman who was diagnosed with gender dysphoria in 2016, prescribed hormone therapy injections, and approved to receive social accommodations including women's undergarments and cosmetics. Kingdom Decl. ¶¶ 8–9, Mot. for Preliminary Injunction Attach. 4, ECF No. 7-4. She was denied her usual hormone shot on three occasions: on January 26, 2025, on February 6, 2025, and on February 12, 2025. *Id.* ¶¶ 13, 16, 19. The commissary at Ms. Kingdom's facility also removed social accommodation items on January 26, 2025. *Id.* ¶ 13. On February 4, 2025, Ms. Kingdom submitted a BP-08 grievance form seeking a restoration of her hormone treatments, and two days later received a response that essentially contained only a recitation the text of Section 4(c) of the Executive Order. *Id.* ¶¶ 17– 18. On February 27, 2025—after the issuance of the First Implementing Memorandum, and just one day before the issuance of the Second Implementing Memorandum—Ms. Kingdom was informed by a local BOP Clinical Director that her access to hormone therapy would not be restored, and that BOP "was receiving new policies confirming the denial of hormone therapy." *Id.* ¶ 20. Ms. Kingdom states that the discontinuation of her hormone therapy caused her to experience anxiety, hopelessness, panic attacks, and suicidal ideation. *Id.* ¶ 21. On March 13 or 14, 2025—about a week after the initiation of this lawsuit, and two weeks after the issuance of the Second Implementing Memorandum—Ms. Kingdom had her access to hormone therapy restored. Suppl. Kingdom Decl. ¶ 2, Mot. for Leave to File Suppl. Decls. Attach. 1, ECF No. 47-1. The BOP avers that Ms. Kingdom received an individualized assessment of her medical needs prior to the restoration of her hormone therapy. *See* Bina Decl. ¶ 17. Ms. Kingdom, however, claims that

4

**Add.8**

the BOP doctor with whom she met had informed her that the decision to restore her treatment had been taken in response to this litigation, and that the original discontinuation decision had been "out of [his] hands."  Suppl. Kingdom Decl. ¶ 2.   Her access to feminine undergarments and commissary items has not been restored.  Suppl. Kingdom Decl. ¶ 6.

Plaintiff Solo Nichols is a transgender man who was diagnosed with gender dysphoria in 2021, prescribed hormone therapy in the form of 100mg testosterone injections, and given access to men's undergarments, men's hygiene products, and chest binders.  Nichols Decl. ¶¶ 6, 7, 13, Mot. for Preliminary Injunction Attach. 5, ECF No. 7-5.[1]  On February 12, 2025, Mr. Nichols was instead given a 50mg dose, and was informed that his next dose would be only 25mg, after which his treatment would be discontinued entirely.  *Id.* ¶ 14.  On February 21, 2025, Mr. Nichols was informed that his original testosterone treatment regimen would be re-implemented.  *Id.* ¶ 17.  The BOP claims that this decision was made "after an individualized assessment" of Mr. Nichols's medical needs, *see* Bina Decl. ¶ 23, but according to Mr. Nichols, BOP staff informed him that the restoration of his therapy would last only as long as "the restraining order is up," presumably in reference to the preliminary injunctive relief that this Court granted in the related case *Doe v. McHenry*, No. 25-cv-286-RCL.  Nichols Decl. ¶ 17.  Mr. Nichols further avers that, although he met with a BOP physician prior to the restoration of his full-dosage treatment, the doctor did not examine him or discuss his mental health, and that the decisions to reduce and then increase the testosterone dosage was made uniformly and at the same time for all transgender men at his facility.  Suppl. Nichols Decl. ¶¶ 1, 3–4, Suppl. Decls. Attach. 1, ECF No. 56-1.  Mr. Nichols was informed during the last week of February that he would no longer have access to boxers or chest binders, and his access to those products has not been restored.  Nichols Decl. ¶ 19; Suppl. Nichols

---

[1] A chest binder is tight-fitting garment worn around the chest to reduce the visibility of breasts.

Decl. ¶ 5.  Mr. Nichols states that he is "very scared to live without testosterone therapy," fearing that he will lose muscle mass and start menstruating again, Nichols Decl. ¶ 18, and likewise maintains that the thought of wearing feminine undergarments makes him feel "deeply uncomfortable, like I can't breathe.  I would feel inadequate and embarrassed."  Suppl. Nichols Decl. ¶ 6.

Lastly, plaintiff Jas Kapule is a transgender man who began receiving hormone therapy and gained access to social accommodation commissary items in 2023.  Suppl. Kapule Decl. ¶ 1, Suppl. Decls. Attach. 2, ECF No. 56-2; Kapule Decl. ¶¶ 5, 7, Mot. for Preliminary Injunction Attach. 6, ECF No. 7-6.  Sometime between January 23, 2025 and March 12, 2025, BOP staff informed Mr. Kapule that his hormone therapy would be discontinued when his current prescription ran out.  Kapule Decl. ¶ 9.  As of April 3, 2025—well after the Complaint was filed— Mr. Kapule continued to believe, based on the BOP's representation, that his therapy would be discontinued with the expiration of his prescription.  Suppl. Kapule Decl. ¶ 3.  His hormone therapy was never discontinued, but on February 24, 2025, Mr. Kapule was told that he would no longer have access to chest binders, and the next day was made to turn in his boxers in exchange for feminine undergarments.  *Id.* ¶ 12.  Mr. Kapule fears that the discontinuation of his therapy would result in the return of his menstrual cycle and will lead to depression.  *Id.* ¶ 13.

On March 17, the plaintiffs filed a Motion for a Preliminary Injunction and for Provisional Class Certification.  *See generally* Mot. for Preliminary Injunction, ECF No. 7.  The plaintiffs seek relief in the form of a stay, pursuant to 5 U.S.C. § 705, of the two implementing memoranda, as well as an injunction forbidding the defendants from enforcing the Executive Order and implementing memoranda's provisions on medical care and social accommodations and ordering them to continue providing gender-affirming hormones and social accommodations in accordance

**Add.10**

with BOP policy prior to the issuance of the Executive Order. *Id.* at 5. On the same day, the

plaintiffs filed a Motion for Class Certification, seeking to certify a class consisting of:

> All persons who are or will be incarcerated in the custody of the BOP who are or will be diagnosed with gender dysphoria or meet the criteria for a gender dysphoria diagnosis and who are receiving, or would receive, gender-affirming health care absent such care being proscribed by EO 14168 and the Implementing Memoranda.

Mot. for Class Certification 1, ECF No. 8. The defendants submitted their opposition to both

motions on March 28, 2025. *See generally* Defs.' Opp'n, ECF No. 46. The plaintiffs then

submitted separate replies in support of their original motions on April 4, 2025. *See generally*

Preliminary Injunction Reply, ECF No. 48; Class Certification Reply, ECF No. 49. Finally, in

response to a handful of supplemental declarations filed by the plaintiffs, the defendants moved to

file a sur-reply on April 9, 2025, *see* Mot. for Leave to File Sur-Reply, ECF No. 52, which the

Court granted on April 28, 2025. *See* Order of April 28, 2025, ECF No. 55. Accordingly, both

motions are now ripe for the Court's review.

For the reasons contained herein, the Court concludes first that the plaintiffs' action is not

barred by the administrative exhaustion requirements of the Prison Litigation Reform Act

("PLRA"); second, that the plaintiffs have demonstrated a substantial likelihood of success on their

APA claims, and that the Court accordingly need not assess the plaintiffs' constitutional claims

based on the limited record now available; third, that the plaintiffs have demonstrated a likelihood

of irreparable harm absent a grant of preliminary injunctive relief, and that the balance of the

equities favors granting such relief; fourth, that the plaintiffs' proposed class meets the

requirements for certification under Rule 23(a) and Rule 23(b)(2); and fifth, that the President shall

not be dismissed from the case as a defendant at this juncture given the potential availability of

declaratory relief. In accord with these legal conclusions, the Court will **ORDER** that the

plaintiffs' proposed class, with slight modification from the Court explained below, be certified

and that class counsel be appointed.  The Court will further **ORDER** the BOP to make social accommodations available to all class members to the same extent they were available prior to the issuance of the Executive Order, and to provide hormone therapy to all class members who have been prescribed hormone medications by BOP or other medical personnel to the same extent as before the issuance of the Executive Order.

## II.    LEGAL STANDARDS

### A.  Preliminary Injunction

Preliminary injunctive relief is warranted if the movant meets its burden to show that 1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief is granted; 3) the balance of the equities favors a TRO or preliminary injunction; and 4) that a TRO or preliminary injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in this Circuit have adopted a sliding scale approach to the TRO analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential.  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  Where, as here, the Government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In evaluating these factors, a Court must bear in mind that preliminary injunctive relief is an extraordinary form of relief that "should be sparingly exercised."  *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (internal citation omitted).  A motion to stay agency action pending review under 5 U.S.C. § 705 is governed by the same standard.  *Green Oceans v. U.S. Dep't of the Interior*, No. 24-cv-141-RCL, 2024 WL 3104945, at *2 n.3 (D.D.C. June 24, 2024) (Lamberth, J.).

8

**Add.12**

**B. Class Certification**

Rule 23 of the Federal Rules of Civil Procedure provides the conditions that must be met for a district court to certify a class. First, pursuant to Rule 23(a), the party moving for class certification must show that:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If all these requirements are met, the putative class must still fit into one of the Rule 23(b) categories, discussed in greater detail below.

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule," which requires the court to conduct a "'rigorous analysis'" of the facts of the case and their applicability to Rule 23's requirements. *Id.* at 351 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "Although the D.C. Circuit has not yet articulated a precise standard of proof, the emerging consensus in this district and among the courts of appeals is that the movant must prove each element of Rule 23 by a preponderance of the evidence." *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 194 & n.2 (D.D.C. 2024) (collecting cases).

**III. THE PLAINTIFFS' CLAIMS ARE NOT MOOT**

Though the defendants do not argue that the case is moot due to the restoration of Ms. Kingdom's or Mr. Nichols's hormone therapy, the Court has an "independent obligation to assure [itself] of jurisdiction," *City of N.Y. v. Nat'l R.R. Passenger Corp.*, 776 F.3d 11, 14 (D.C. Cir. 2015), so the Court will briefly address this possibility. "[A]t least one named plaintiff must keep her individual dispute live until [class] certification, or else the class action based on that claim

**Add.13**

generally becomes moot." *J.D. v. Azar*, 925 F.3d 1291, 1307 (D.C. Cir. 2019) (citing *United States v. Sanchez-Gomez*, 584 U.S. 381, 386 (2018)).

Clearly, the named plaintiffs' requests for access to social accommodations is not moot because, as recounted above, all three remain unable to access garments and other items intended to help the plaintiffs conform their appearance to that of the opposite sex. Mr. Kapule's request for the continuation of his hormone therapy is not moot because, as far as the Court is aware, Mr. Kapule remains under the impression that his hormone therapy will be discontinued when his prescription runs out, and thus has a live claim for relief that persists to this day. That alone would be sufficient to keep this action alive. But furthermore, Ms. Kingdom's and Mr. Nichols's claims for hormone therapy access are not moot either because of a mootness exception known as the "voluntary cessation" doctrine, which dictates that "[a] party's voluntary cessation of challenged conduct does not moot the challenge unless it is "absolutely clear" that the challenged conduct will not recur after the litigation." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1230 (D.C. Cir. 2023) (citing *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017)). In Ms. Kingdom's case, there is no indication at all that the BOP means to leave her hormone therapy in place long-term; indeed, as noted above, she was informed by BOP personnel that the decision to resume her treatment was a consequence of this litigation itself, raising the specter that her treatments might be discontinued as soon as the litigation has concluded. Suppl. Kingdom Decl. ¶ 2. Likewise in Mr. Nichols's case: The BOP official with whom he spoke told him explicitly that the hormone therapy ban would resume once the injunctive relief granted in *McHenry* had run its course. Nichols Decl. ¶ 17. Accordingly, Ms. Kingdom's and Mr. Nichols's claims related to the cessation of hormone therapy are not moot under the voluntary cessation doctrine.

The defendants argue separately that the plaintiffs' request for a stay of the BOP's actions while the case remains under review, pursuant to 5 U.S.C. § 705, is moot because the BOP has already taken the actions that, according to the plaintiffs, are violative of the APA. That argument is unpersuasive, as various courts have interpreted § 705 to permit a "stay"—which may be more aptly described as a temporary rollback—even of already-consummated agency action. *See, e.g.*, *Texas v. Biden*, 646 F. Supp. 3d 753, 769–771 (N.D. Tex. 2022) (collecting cases from the Supreme Court and Fifth Circuit); *Boyle v. Bessent*, No. 2:24-cv-81-SDN, 2025 WL 509519, at *4 n.5 (D. Me. Feb. 14, 2025).

Having assured itself that all of the plaintiffs' claims are alive and well, the Court may proceed to the next jurisdictional issue in the case: whether the plaintiffs were required to exhaust administrative remedies before initiating their action in federal court.

## IV. THE PLAINTIFFS WERE NOT REQUIRED TO EXHAUST ADMINISTRATIVE REMEDIES UNDER THE PLRA

The defendants' first argument, which the Court must take up before reaching the merits because it speaks to the Court's jurisdiction to entertain this dispute, is that the plaintiffs have failed to complete the grievance procedure prescribed by the PLRA. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life . . . ."); *Jones v. Bock*, 549 U.S. 199, 211 (2007) (holding that inmates' unexhausted claims "cannot be brought in court"). Under that remedial scheme, to challenge any aspect of an inmate's confinement, that inmate must proceed through four steps. First, an inmate must attempt to resolve the problem informally with prison officials; second, if unsuccessful, the inmate may initiate a request to the warden of their penitentiary facility; third, if unsatisfied by the warden's response, the inmate may appeal to the regional BOP director within twenty calendar days; and finally, if the regional director does not provide the relief sought, the inmate may escalate the

11

**Add.15**

complaint to the BOP's general counsel office within thirty days.  28 C.F.R. §§ 542.13–15. *DeBrew v. Atwood*, 847 F. Supp. 2d 95, 107 (D.D.C. 2012).

As this Court wrote in *McHenry*, courts are obliged to hew strictly to the PLRA's mandatory exhaustion requirement: "not even facially meritorious constitutional claims are exempt, nor are claims that the inmate believes—rightly or wrongly—to be futile." *McHenry*, 763 F. Supp. 3d at 86 (first citing *Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006), and then citing *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) (Sentelle, C.J.)).  However, while courts have no power to carve out new exceptions from the PLRA's statutory text, they must apply the narrow implicit exception that Congress wrote into the statute itself: that exhaustion is not required if administrative remedies are not "available." *Ross v. Blake*, 578 U.S. 632, 639 (2016). Administrative remedies are considered "unavailable" if the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use," or if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation" or, as relevant here, if the grievance process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643–44.  The D.C. Circuit has underscored the difference between the dead-end exception and the concept of futility: If the agency has "authority to take *some action*" in response to a complaint, but not the action which the plaintiff seeks, exhaustion remains mandatory notwithstanding the claim's futility. *Kaemmerling*, 553 F.3d at 675.  However, if the agency "lacks authority to provide any relief or to take any action whatsoever in response to a complaint," the plaintiff has reached a genuine dead end and administrative exhaustion is excused. *Id.* at 675 (quoting *Booth v. Churner*, 532 U.S. 731, 736 (2001)).

The defendants contend that the plaintiffs are not confronted with a dead-end situation because, as discussed above, each plaintiffs' access to hormone therapy has been restored. And moreover, the BOP is currently providing hormone therapy to roughly 628 of the 1,028 BOP inmates diagnosed with gender dysphoria. Bina Decl. ¶¶ 7, 14. At a preliminary injunction hearing held on May 22, 2025, the defendants attempted to explain, for the first time, how this reality can be reconciled with the text of the Executive Order. They argued that the BOP's policy is to provide hormone therapy to inmates as necessary to address medical needs *other than* "conforming an inmate's appearance to that of the opposite sex," such as to ameliorate anxiety, depression, or suicidality associated with gender dysphoria. Therefore, they argue, the BOP has the authority to provide not just *some* relief, but the very relief that the plaintiffs sought in their Complaint—to wit, restoration of their hormone therapy.[2]

In response, the plaintiffs reiterated at the hearing one plaintiff, Alishea Kingdom, filed an initial BP-08 grievance form with the staff at her penitentiary requesting access to her gender

---

[2] The Court pauses to underscore the apparent inconsistency of this position with the text of the Executive Order. The defendants are representing that, even though the text plainly says that BOP may not use federal funds "for the purpose of conforming an inmate's appearance to that of the opposite sex," BOP is still using federal funds for treatments (such as hormone therapy) that have that exact effect. But, the defendants state that for inmates who have *additional* reasons for those treatments, *separate from* appearance conformity (e.g. to combat symptoms such as anxiety, depression, and suicidality), the Executive Order does not prohibit the use of federal funds for treatments that will inevitably conform a person's appearance to that of the opposite sex.

The plaintiffs argue that the defendants' distinction between treatment for the purpose of appearance-conformity and symptom-mitigation is imaginary, and that hormone therapy is only effective to treat these symptoms *because* it alters the user's physical appearance. In other words, the symptom alleviation flows from the change in appearance. That is a question of medical fact that the Court lacks requisite information to resolve at this time. Yet even in the current posture, the Court observes that the defendants' position does indeed seem hard to square with the text of the Executive Order. The defendants appear to be relying on a fabricated distinction that appears nowhere on the face of the Order— representing that some prisoners seek medical treatment *solely* for appearance conformity, with no other symptoms of gender dysphoria requiring medical attention, and it is merely *those* prisoners whom the Executive Order bars from receiving hormone treatment.

In any event, if the BOP's current practice is indeed inconsistent with the Executive Order as the plaintiffs suggest, that is not immediately relevant to the Motions presently under consideration. The Court merely emphasizes this position given that it is not explained in the defendants' papers and it is not the most natural reading of the Executive Order, to say the least.

13

**Add.17**

dysphoria treatment, which was met with a response merely reciting the terms of the Executive Order.  Kingdom Decl. ¶ 17.  This negative response, they contended, shows that administrative remedies were not "available" to the plaintiffs.  This argument is unavailing.  Although the BOP's response was undoubtedly not the response that Ms. Kingdom wanted, she completed only the first step of the four-step administrative exhaustion process.  If a negative response at step one—no matter how firm or uncompromising—could by itself constitute an administrative "dead-end", the exception would soon swallow the rule, and there would be nothing left of the PLRA's exhaustion scheme.

Nevertheless, under the unusual circumstances of this dispute, administrative exhaustion was not required.  That is because administrative exhaustion under the PLRA is assessed as of the date that a complaint is filed, not as of the date that a motion is filed or the date at which the court is rendering its decision.  *United States v. Dunlap*, 485 F. Supp. 3d 129, 131 n.2 (D.D.C. 2020) (Brown Jackson, J.) ("[I]n considering motions to dismiss for failure to exhaust under [the Prison Litigation Reform Act], the district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred.") (quoting *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003)); *cf. Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) ("[T]he jurisdiction of the court depends upon the state of things at the time of the action brought.") (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824)); *Norton v. United States*, 530 F. Supp. 3d 1, 7 (D.D.C. 2021) (holding, in the FTCA context, that "the appropriate analysis is whether the claimant exhausted her administrative remedies *at the time she filed her complaint*") (emphasis in original).  This rule normally works to shield the BOP from plaintiffs' efforts to skirt the PLRA's remedial scheme, but here it serves a complementary purpose: The BOP may not erect a dead-end administrative exhaustion process, then invoke the

protections of the PLRA by strategically replacing the dead-end remedial process with a viable one as soon as a plaintiff sues in federal court.  It cannot have its cake and eat it too.[3]

Therefore, the operative question is not whether the plaintiffs *would* be required to exhaust their administrative remedies under the circumstances now prevailing for gender dysphoric BOP inmates—a question as to which the Court expresses no opinion.  Rather, the question is whether the plaintiffs *were* required to do so under the circumstances prevailing on March 7, 2025, when their Complaint was filed.

Recall that, as of March 7, two of the three named plaintiffs—Ms. Kingdom and Mr. Nichols—had already had their hormone therapies discontinued or reduced, whereas the third—Mr. Kapule—had been promised that his hormone therapy would be discontinued as soon as his prescription ran out.  Ms. Kingdom and Mr. Nichols were told explicitly that the discontinuation of their hormone therapy was attributable to the Executive Order.  *See* Kingdom Decl. ¶ 12; Nichols Decl. ¶ 14.  As already discussed, the BOP's response to Ms. Kingdom's BP-08 largely recited the terms of the Executive Order.  And similarly, Mr. Kapule submitted a BP-08 form on March 3, 2025, to which the BOP responded on March 12, also citing the Executive Order and stating that "[u]ntil further notice, the Bureau of Prisons will follow any updated policies published by the Department of Justice."  Kapule Decl. ¶ 15.  These facts suggest that, as of the time that the Complaint was filed, the BOP's policy and the Executive Order were essentially one and the same, and that the BOP was then interpreting the Executive Order to forbid the provision of hormone therapies.

---

[3] This should not be taken to suggest, at this early stage in the proceedings, that the BOP has engaged in such bad-faith gamesmanship.  Indeed, as the defendants point out in their sur-reply, agencies such as the BOP have historically received a "presumption of good faith and regularity in agency action . . . ."  *Sierra Club v. Costle*, 657 F.2d 298, 334 (D.C. Cir. 1981).  The Court is merely stating, in the abstract, a justification for this rule of general applicability.

15

**Add.19**

Furthermore, consider the circumstances under which the plaintiffs' treatments were restored.  Ms. Kingdom noted that her hormone therapy was not restored until March 14, 2025—a week *after* the Complaint was filed—at the same time as nine other transgender women at her facility, after a conversation in which the BOP physician explicitly referred to this litigation.  Suppl. Kingdom Decl. ¶¶ 1–2.  Although Mr. Nichols's treatments were restored before the Complaint was filed, that evidently happened in response to the events unfolding in the parallel *McHenry* litigation, rather than pursuant to a change in BOP policy.  Nichols Decl. ¶17.  And even as of April, Mr. Kapule's situation remained largely unchanged since February: he was still under the impression that his hormone therapy would be discontinued as soon as his prescription expires.  Suppl. Kapule Decl. ¶ 3.

Taking these largely uncontroverted facts into consideration, even if the BOP has recently instituted policies allowing for the provision of hormone therapy to certain inmates with demonstrable medical needs, it seems clear that this was not the policy in place at the time that the Complaint was filed.  As of March 7, 2025, all evidence suggests that the BOP's policy at the time was to withhold hormone therapy except where a court order mandated it do otherwise.  To the extent that the BOP now claims that the text of the Executive Order and the implementing memoranda afford it some discretion to provide hormone therapy to those inmates who most desperately need it—in other words, "to take some action" in response to the plaintiffs' grievances—the agency's conduct during the days and weeks surrounding the filing of the Complaint strongly implies that this was not the agency's understanding at the time.

In sum: the plaintiffs challenge the BOP's actions as unconstitutional and contrary to the Administrative Procedure Act.  The BOP's conduct contemporaneous with the filing of that challenge all but declares that the agency believed itself to have no authority, under the Executive

16

**Add.20**

Order and its own implementing memoranda, to act on the plaintiffs' grievances.  Under those circumstances, the plaintiffs had reached an administrative dead end, so their suit could move forward notwithstanding their failure to exhaust administrative remedies, and notwithstanding the BOP's reconceptualization of its own authority in the months that followed the initiation of the action.

## V.    THE PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF

### A. The Plaintiffs Are Likely to Succeed on the Merits of their APA Claims.

The plaintiffs argue that the BOP's enforcement of the Executive Order and the two implementing memoranda violate the APA's prohibition of arbitrary and capricious agency action. Specifically, the plaintiffs argue that the memoranda are arbitrary and capricious because they provide no reasoned explanation for the denial of gender-affirming care, treat gender dysphoria different than other medical conditions with no justification, and fail to adequately take stock of the sudden reversal in agency policy from before the Executive Order was issued.  The Court agrees, and accordingly holds that the plaintiffs are likely to succeed on the merits of their APA claims.[4]

### 1.  The Plaintiffs Are Challenging Final Agency Action

As a threshold matter, the Court must determine whether the BOP's decisions constitute "final agency action" susceptible to APA review.  5 U.S.C. § 704.  Executive orders themselves are not susceptible to APA review for the simple reason that "the President is not an 'agency' under [the APA] . . . ."  *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996); *see also League of United Latin Am. Citizens v. Exec. Off. of President*, No. 24-cv-0946, 2025 WL

---

[4] The plaintiffs also contend that the BOP's actions should be set aside as contrary to law because they violate the Eighth Amendment to the United States Constitution.  As discussed below, the Court declines to reach the plaintiffs' constitutional arguments at this time, and accordingly will not take up this aspect of the plaintiffs' APA claims.

**Add.21**

1187730, at \*16 (D.D.C. Apr. 24, 2025) (holding that, because the President is not an agency, "the APA does not supply a cause of action to challenge an executive order").  However, where the President delegates the implementation of an executive order to an agency, that agency's actions are not derivatively shielded from APA review.  *See Tate v. Pompeo*, 513 F. Supp. 3d 132, 142–43 (D.D.C. 2021) (holding that an "attempt to bootstrap the nonreviewability of presidential actions to discretionary authority delegated to" an agency did "not have support in precedent"); *Gomez v. Trump*, 485 F. Supp. 3d 145, 176–77 (D.D.C. 2020) ("To the extent Defendants contend that the court is foreclosed from reviewing agency actions taken to implement [Presidential] Proclamations, they are wrong.") (emphasis omitted); *O.A. v. Trump*, 504 F. Supp. 3d 109, 147 (D.D.C. 2019).  Here, such a delegation plainly appears on the face of the Executive Order.  *See* Executive Order 14168 § 4(c) (instructing the Attorney General and BOP to "revise[] [the BOP's] policies concerning medical care to be consistent with this order").  Therefore, the BOP's actions taken pursuant to this directive, including the implementing memoranda, do not partake of the President's exemption from APA review.

Having determined that the actions challenged here are those of an "agency," the next question is whether they are "final."  An agency's action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow . . . .'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  Both aspects of the *Bennett* test are met here.  It appears clear that the agency had made up its mind with respect to the plaintiffs' gender-affirming care as of the date that the Complaint was filed.  The implementing memoranda, quoted earlier in this Opinion, do

not utilize equivocal language or otherwise suggest that the agency was still in the midst of its decisionmaking process at the time of their issuance. And the plaintiffs' experiences confirm that, by March 7, the agency was no longer mulling whether the plaintiffs' hormone therapy should cease. As recounted above, in the case of Ms. Kingdom, her hormone medication had already been discontinued for forty days, during which time she missed three scheduled treatment sessions. In the case of Mr. Nichols, his hormone therapy had been restored, but the BOP represented that this restoration was only a temporary measure occasioned by the *McHenry* litigation, and that the decision had evidently been made to terminate his medications as soon as the litigation was resolved. And with respect to Mr. Kapule, the plaintiff remained under the impression, even *after* the Complaint was filed, that the decision to terminate his medications after the expiration of his current prescription was still in effect. And all this is to say nothing of the BOP's withholding of social accommodations, which was in effect by the time the Complaint was filed and remains so today.

Certainly, then, the BOP's actions with respect to Ms. Kingdom were "consummated" and represented the agency's final disposition of her right to access hormone therapy, and of the BOP's supposed obligation to provide it. And with respect to Mr. Nichols and Mr. Kapule: though the challenged deprivation had not yet taken place when the Complaint was filed, the BOP's *decisionmaking process* undergirding the future termination of their treatments was complete, which is all that *Bennett* requires.[5] The fact that, after the Complaint was filed, the agency later restored Ms. Kingdom's access to hormone therapy and seemingly altered its hormone therapy policies makes no difference to the finality determination: "[T]he possibility that a decision may

---

[5] Because the decision to terminate Mr. Nichols and Mr. Kapule's treatments had been made in full, this is not the sort of situation where the adverse effects of the action depend "on the contingency of future administrative action." *Rhea Lana, Inc. v. U.S. Dep't of Lab.*, 824 F.3d 1023, 1032 (D.C. Cir. 2016) (internal quotation omitted) (quoting *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996)).

**Add.23**

later be revised based on new information does not render 'an otherwise definitive decision nonfinal.'" *Seeger v. Dep't of Def.*, 306 F. Supp. 3d 265, 285 (D.D.C. 2018) (quoting *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016)); *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 400 (D.C. Cir. 2020) ("The possibility of revision 'is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal.'") (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016)).[6]

## 2. The Plaintiffs have Demonstrated a Likelihood that the BOP's Actions Were Arbitrary and Capricious.

The APA provides certain standards by which an agency must abide in the course of formulating and executing policy, and empowers courts to "set aside" agency action that does not conform to these standards. 5 U.S.C. § 706(2). Relevant here, agency action may be set aside if it is "arbitrary" or "capricious." *Id.* § 706(2)(a). Among other possible reasons, agency action may be deemed arbitrary and capricious if it is taken without an "explanation," *see Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019), or if that explanation evinces a lack of "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), i.e. a failure to "consider[] . . . the relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Alternatively, an agency action may earn the moniker of "arbitrary and capricious" if it violates the "fundamental principle of administrative law that agencies must treat like cases alike," *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023), and fails to "point to a relevant distinction" between two facially similar cases that it decides to treat differently. *Westar Energy, Inc. v. Fed. Energy Regul. Com'n*, 473 F.3d 1239, 1241 (D.C. Cir.

---

[6] Even if the agency *did in fact* revise its policies after the submission of the plaintiffs' Complaint, which appears to be the case here, that fact—knowable only with the benefit of hindsight—does not implicate the APA's finality requirement. Rather, it goes to whether the plaintiffs' claims are moot, a possibility with which the Court has already dispensed above.

2007).  And finally, when an agency adopts a new policy that reverses course from its prior policy, the new policy is not subject to a "heightened standard," but the agency must "display awareness that it *is* changing position" and provide a "more detailed justification than what would suffice for a new policy created on a blank slate" if the new policy "rests upon factual findings that contradict those which underlay its prior policy" or where the "prior policy has engendered serious reliance interests . . . ."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009).

The BOP's implementing memoranda fall short on each of these criteria.  The BOP's *only* explanation for its new policies is that the Executive Order required the adoption of those policies, and that the Executive Order itself provided adequate explanations for BOP's new policies.  *See* Defs.' Opp'n at 20–21.  But as numerous courts have held, the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review.  *See, e.g.*, *Gomez*, 485 F. Supp. 3d at 177 ("APA review of an Executive Branch official's actions is . . . not precluded merely because the official is carrying out an executive order."); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (E.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.  A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order."); *Texas v. United States*, 524 F. Supp. 3d 598, 653–54 (S.D. Tex. 2021) (determining that a Department of Homeland Security memorandum issued to confront the COVID pandemic was arbitrary and capricious, despite the fact that it "stem[med] from" an Executive Order signed contemporaneously by the President, because it failed to independently demonstrate reasoned decisionmaking).  The reason for this rule is self-evident: if an agency could avoid the need to justify its decisions simply by gesturing to an Executive Order and claiming that it was just following the President's directions, the President could unilaterally eviscerate the

21

**Add.25**

judicial oversight that Congress contemplated in passing the APA simply by issuing a carbon-copy executive order mandating that an agency act in a particular way before it does so. *See Arizona v. Su*, 1221 F.4th 1, 15 (9th Cir. 2024).

Moreover, even if the BOP may incorporate the Executive Order's reasoning into its own implementing memoranda, the reasoning contained therein is plainly deficient. Section 1 of the Executive Order sets out its manifold purposes: to promote the "dignity, safety, and well-being" of women, as well as "scientific inquiry, public safety, morale, and trust in government," by combatting the spread of "gender ideology" which denies "the immutable biological reality of sex" in favor of "an identity-based, inchoate social concept." The Court takes no position on the desirability of this goal; a Court conducting judicial review under the APA may not "substitute [its own] judgment for that of the agency . . . ." *Steel Mfr's Ass'n v. EPA*, 27 F.3d 642, 646 (D.C. Cir. 1994). But even taking the Executive Order's rationale at face value, it has little, if anything, to do with the agency's decision to discontinue inmates' gender-affirming care. By taking hormone medications and accessing social accommodations, the plaintiffs do not seem interested in propagating any particular "ideology"; to the contrary, their sworn declarations make clear that they are taking these measures to lessen the personal anguish caused by their gender dysphoria, a benefit on which they have relied for years under the BOP's longstanding policy of providing this type of care. In light of the plaintiffs' largely personal motives for undergoing gender-affirming care, neither the BOP nor the Executive Order provides any serious explanation as to why the treatment modalities covered by the Executive Order or implementing memoranda should be handled differently than any other mental health intervention. Nor does the Executive Order make any effort whatsoever to explain how providing hormone medications or social accommodations to prisoners hampers "scientific inquiry, public safety, morale, trust in government," or any other

virtue animating the Executive Order. And nothing in the thin record before the Court suggests that either the BOP or the President consciously took stock of—much less studied—the potentially debilitating effects that the new policies could have on transgender inmates before the implementing memoranda came into force.

To be sure, agency action is not arbitrary and capricious merely because it is bad for some identifiable population. New policies nearly always have uneven effects on different groups; that is part and parcel of living within a democratic system. But the APA *does* require an agency to take actions that are rationally and demonstrably related to its stated goals, explain why it treats similarly situated people differently, and give consideration to the reliance interests of those who may be harmed by a new policy. Based on the limited information now before the Court, it appears that the implementing memoranda do none of these things, nor does the Executive Order on which they rely for their own justification. Accordingly, the Court concludes that the plaintiffs have established a sufficient likelihood of success on the merits of their APA claims.

"[A]s a matter of judicial restraint and 'governance,' courts generally should endeavor to resolve cases on non-constitutional grounds and should entertain constitutional questions only when necessary." *Uthman v. Trump*, 486 F. Supp. 3d 350, 356 (D.D.C. 2020) (Lamberth, J.) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346 (1936)). It stands to reason that the need for such "judicial restraint" is heightened in cases, such as the one at hand, where the factual record is necessarily thin due to the procedural posture of the litigation. Therefore, because the Court assesses that the plaintiffs are likely to prevail on their APA claims, the Court need not delve into the merits of their Eighth Amendment claims at this time.[7]

---

[7] The Court notes that, in *McHenry*, the Court instead took up the plaintiffs' constitutional claims while leaving their APA claims for another day. *See* 763 F. Supp. 3d at 85. There is a good reason for this difference in approaches: in *McHenry*, the defendants pointed to two statutory provisions that potentially foreclosed any consideration of the

23

**Add.27**

**B. The Plaintiffs Have Shown Sufficient Likelihood of Irreparable Harm**

Turning to the second aspect of the preliminary injunction analysis, the Court concludes that that the plaintiffs have demonstrated a sufficient likelihood of irreparable harm in the absence of preliminary injunctive relief. The defendants argue that the plaintiffs have not alleged irreparable harm because they are all currently receiving hormone medications. But it suffices to say that all three plaintiffs' access to hormone therapy is, as best the Court can tell, tenuous. As already discussed, one named plaintiff, Ms. Kapule, remains under the impression that her hormone therapy will be terminated as soon as her prescription runs out, unless the Court orders otherwise. The other two have both been advised by BOP officials that their continued access to hormone therapy depends on the vagaries and vicissitudes of this very litigation and its related cases; based on these statements, it seems probable that without an order to the contrary, these plaintiffs will lose access to their medicine. Though the BOP represents that more than 600 other inmates with gender dysphoria are receiving hormone treatments, it has given no affirmation that these treatments would be likely to continue in the absence of judicial intervention. Circumstantial evidence suggests otherwise: When Mr. Nichols's and Ms. Kingdom's access to hormone therapy was restored, they noted that other inmates at their facility were given access to medicine all at the same time, suggesting that their fates have risen and—without an injunction—will likely fall together. And all of this is to say nothing of the *ongoing* deprivation of the plaintiffs' social accommodations, which is uncontested.

Just as the plaintiffs' harms are either manifest already or imminent and likely, so too are they severe. As recounted above, Dr. Karasic's declaration explains that gender dysphoria can

---

*McHenry* plaintiffs' APA claims, meriting a departure from the usual practice of avoiding constitutional claims except where necessary. *Id.* (citing 18 U.S.C. §§ 3621, 3625). By contrast, in the case at hand, the defendants have identified no statute or regulation that would seem to immunize the challenged policies from judicial review under the APA.

24

**Add.28**

produce severe side effects ranging from depression and anxiety to suicidal ideation and self-harm if inadequately treated. The BOP does not dispute this medical reality, and indeed the declaration of Chris Bina, Assistant Director of the BOP's Health Services Division, seems to confirm as much when it states that the three named plaintiffs are currently "receiving medically necessary care," referring to their restored hormone therapy regimens. Nor are these abstract dangers confined to the pages of medical textbooks and prison care manuals: Ms. Kingdom herself attests that during the interruption of her hormone therapy she lost sleep, began having suicidal thoughts, and regularly contemplated autocastration. Kingdom Decl. ¶¶ 21–22. These are not the sorts of harms capable of recompense through normal judicial processes.

The defendants' only other argument is that some gender dysphoric people do not need hormone therapy, so the possibility that they may not be able to receive it does not constitute irreparable harm. Defs.' Opp'n at 22–23. Though true, this argument misses the point. All parties seem to agree that the named plaintiffs do, in fact, need hormone therapy. That being the case, it is virtually certain that at least some other current and future gender dysphoric inmates need or will need it as well, and even that some gender dysphoric inmates who do not presently need it will need it in the future. The Court can reasonably infer that at least some gender dysphoric inmates would be immediately and irreparably harmed by a return to the BOP's policies in effect as of the initiation of this action, an outcome that seems likely without preliminary judicial intervention.

### C. The Balance of the Equities and the Public Interest Favor an Injunction

The final piece of the preliminary injunction analysis is the most easily resolved. In *McHenry*, this Court held that the balance of the equities and the public interest favored preliminarily enjoining the enforcement of the Executive Order's provision requiring the rehousing

of certain transgender inmates in facilities consistent with their birth sex and the denial of hormone therapy. 763 F. Supp. 3d at 89–90. As the Court then explained, "it is hard to cognize of *any* public interest in the immediate cessation of [the *McHenry* plaintiffs'] hormone therapy—aside, perhaps, from whatever small sum of money the BOP may save by ceasing administration of these drugs, or the abstract interest in the enforcement of Executive Branch policy decisions." *Id.*

In the case at hand, the equities tilt even more strongly in the plaintiffs' favor, because the BOP now represents that it *is, in fact, providing hormone therapy to over 600 gender dysphoric inmates.* Therefore, the defendants cannot even credibly claim that an injunction will impose a financial burden, since according to their own representations they would incur that burden anyway. The only deleterious public effect of the Court's injunction will be to require that, during the pendency of litigation, the BOP will continue to shoulder a certain administrative cost that it has already willingly assumed since the commencement of this action, and that it had voluntary borne for many years prior.

The defendants argue that there is a strong countervailing public interest in letting democratic processes play out and allowing elected leaders to effectuate their political agendas. Defs.' Opp'n at 31. The court readily endorses this principle, and agrees that it weighs in the defendants' favor, but it does so only modestly. That is because democracy is not as simple as the defendants make it sound: Just as the Executive Order was issued by a democratically elected President with a platform to implement, so too is the Administrative Procedure Act the output of democratic processes, namely the constitutional schema of bicameralism and presentment. If democratic self-governance means anything, it means giving effect to *all* duly enacted laws, including those—like the APA—that were enacted decades ago; it does not mean blind submission to the whims of the most recent election-victor.

26

**Add.30**

Finally, the defendants contend that the effect of a preliminary injunction at this stage would stifle the ongoing debate about the medical necessity and efficacy of gender-affirming care. At this stage of litigation, the Court lacks the factual record necessary to know whether such a debate exists. But even assuming it does, granting a preliminary injunction would do no such thing. To conclude that the defendants have failed to meet the procedural strictures of the APA is not to take any position on the underlying merits of the BOP's substantive policy decisions or the goals motivating the Executive Order.[8]

## VI.    THE COURT WILL CERTIFY A CLASS AND APPOINT CLASS COUNSEL

The plaintiffs' proposed class definition, with slight adjustments made by the Court, satisfies each of the requirements of Rule 23(a) and falls under the rubric of Rule 23(b)(2). *See Wagner v. Taylor*, 836 F.2d 578, 590 (D.C. Cir. 1987) (noting a court's "broad discretion to redefine and reshape the proposed class to the point that it qualifies for certification under Rule 23"); Charles A. Wright & Arthur R. Miller, 7A Fed. Prac. & Proc. § 1759 (4th Ed. 2025) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may . . . redefine the class to bring it within the scope of Rule 23 . . . ."). Therefore, the Court will certify a class consisting of all persons who are currently or will be incarcerated in BOP facilities with a current diagnosis of gender dysphoria or who receive such a diagnosis in the future.[9] The Court will also appoint counsel to represent that class.

---

[8] It is conceivable that the Court will be required to make a factual determination about the medical necessity of gender-affirming care at some later stage of litigation to address the plaintiffs' constitutional claims, though even this is not a foregone conclusion. It is certain, however, that the Court need not and will not make any such determination now.

[9] The plaintiffs' proposed class definition would include all BOP inmates who "meet the criteria for a gender dysphoria diagnosis . . . ." Mot. for Class Certification at 1. The Court has excised this group from the class definition because it introduces uncertainty and unascertainability into the class, and risks freezing medical standards in time. The Court lacks the requisite information to know what it means to "meet the criteria for a gender dysphoria diagnosis," and even it did, the Court must be sensitive to the possibility that those criteria may change over time. Admitting new class members on the basis of an actual diagnosis is an easily administrable task that supports the ascertainability of

27

**Add.31**

## A. The Proposed Class Satisfies Rule 23(a).

Any proposed class must meet the familiar requirements of Rule 23(a), often referred to in brief as numerosity, commonality, typicality, and adequacy of representation.

### 1. Numerosity

Numerosity is not in dispute. The proposed class would include all current and future BOP inmates diagnosed with gender dysphoria. Mot. for Class Certification at 1. The BOP represents that, at present, there are 1,028 inmates with gender dysphoria in its custody. Bina Decl. ¶ 7. That is more than enough to satisfy Rule 23(a)'s numerosity requirement, even if not for the fact that the class definition includes an unknown number of future class members as well. *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) ("[C]lasses including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'") (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:15 (5th Ed. 2018)).

### 2. Commonality and Typicality

The defendants contend that the proposed class does not meet the requirements of commonality and typicality because whether any individual class member is in need of gender-affirming care is an individual inquiry that is not susceptible to class-wide resolution. Defs.' Opp'n at 24–27. This is particularly problematic, argue the defendants, because the plaintiffs allege a

---

the class; speculating about whether a given individual *may* be a new class member by comparing his or her constellation of symptoms to the most recent medical understanding of gender dysphoria is not.

The Court has also deleted the plaintiffs' qualifier that class members either be "receiv[ing], or would receive, gender-affirming health care absent such care being proscribed by EO 14168 and the Implementing Memoranda." First, this qualifier is unnecessary: It appears more logical to extend relief to all BOP inmates with gender dysphoria, and who may therefore be eligible for gender-affirming care, rather than to limit it to those who are in fact receiving such care or would be. Second, it is hopeless to speculate about whether any given individual "would receive" gender-affirming care in the absence of the Executive Order or implementing memoranda because, as all seem to agree, not all people with gender dysphoria need hormone therapy.

28

**Add.32**

violation of their Eighth Amendment protections, which requires both that "the plaintiff must be confronted with an 'objectively intolerable risk of harm,' and [that] prison officials must knowingly or recklessly subject the plaintiff to such a known risk." *McHenry*, 763 F. Supp. 3d at 88 (quoting *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994). This dual objective and subjective analysis is necessarily fact specific as to each prospective class member, rendering it a poor fit for resolution en masse.

If the contemplated relief were for each class member to be provided with gender-affirming care, the defendants might be right; whether such care is appropriate for any given inmate is indeed a person-specific judgment. But that is not the nature of the plaintiffs' claims, nor does it accurately describe the relief sought. Though the members of the putative class have their own distinctive medical needs, they are united insofar as they each share a diagnosis of a condition that is sometimes treated by the provision of gender-affirming care. The plaintiffs do not claim that all class members are actually injured by the denial of gender-affirming care, but rather by a blanket policy that may prevent them from accessing such care, should they be deemed to need it due to their shared medical condition. While the Court may not be able to answer whether all individual class members should receive gender-affirming care on a class basis, the questions that the plaintiffs *do* present—i.e. whether a uniform policy prohibiting people with a given medical condition from receiving a certain treatment for that condition violates the Eighth Amendment or the Administrative Procedure Act—*are* amenable to judicial consideration without the Court wading into a thousand personalized medical assessments.[10]

---

[10] As before, the defendants argue that no such blanket policy exists, as demonstrated by their ongoing provision of hormone therapy to hundreds of inmates. But this argument is, at this stage, unavailing for at least two reasons. First, it begs the question as to what the BOP's policy is today, which remains a matter of dispute. Second, although the defendants represented at the hearing that the BOP will continue to provide hormone therapy to inmates for whom it is medically necessary, that policy is not in the record before the Court.

### 3.  Adequacy

Finally, the defendants' one-paragraph argument that the plaintiffs' claims do not meet the adequacy requirement of Rule 23(a) also fails.  Defs.' Opp'n at 27. The defendants argue that because the plaintiffs' individual medical conditions may not be identical to those of the putative class members, they are not likely to be able to adequately represent the interests of the putative class members.  *Id.* at 27.  But this is clearly wrong.  In order to adequately represent the other members of the class, the named plaintiffs "(i) must not have antagonistic or conflicting interests with the unnamed members of the class and (ii) must appear able to vigorously prosecute the interests of the class through qualified counsel."  *J.D.*, 925 F.3d at 1312.

As the plaintiffs point out, the named plaintiffs and putative class members all face the same *legal* injury: namely, the harm that will flow from a uniform policy prohibiting prescribed medical treatment.  The named plaintiffs have each been diagnosed with gender dysphoria and seek gender-affirming care just like every other member of the putative class.  And they have demonstrated, through sworn declarations submitted to the Court, that they are committed to vigorously prosecuting the interests of the putative class members.  *See generally* Kingdom Decl.; Nichols Decl.; Kapule Decl.  Even if the defendants were right that the named plaintiffs suffer medical conditions different from the rest of the putative class, their harm flows from the same acts of the defendants as the rest of the putative class: the Executive Order and BOP implementing memoranda.  Indeed, it would not be possible for the named plaintiffs to obtain full relief without enjoining the actions of the Executive branch.

The Court thus finds that the four requirements of Rule 23(a) are met.  Additionally, the Court is satisfied that the plaintiffs' attorneys of record satisfy the requirements of Rule 23(g) and

can adequately represent the putative class as class counsel. The defendants do not oppose this appointment.

### B. The Proposed Class is Certifiable Under Rule 23(b)(2)

Once a plaintiff has cleared the hurdles of Rule 23(a), they must show that the class can be certified under Rule 23(b). The plaintiffs argue that their claims satisfy the requirements of Rules 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2), and the Court evaluates each argument in turn. For the reasons that follow, the plaintiffs' arguments under Rules 23(b)(1)(A) and (B) fail, but their claims are certifiable Rule 23(b)(2).

#### 1. Rule 23(b)(1)(A)

If the Court determines that "inconsistent or varying adjudications with respect to individual class members . . . would establish incompatible standards of conduct for the party opposing the class," then it may certify a class to avoid such inconsistency under Fed. R. Civ. P. 23(b)(1)(A). The plaintiffs claim that because there are over 2,000 potential members of the putative class, the risk of imposing a different standard on the defendants from individual adjudication is high. Mot. for Class Certification at 11. The defendants argue that there is no such risk because the PLRA requires injunctive relief to be limited to the plaintiffs only. Defs.' Opp'n at 28. Neither side's position fully captures the spirit of the Rule.

The plaintiffs are right that there is a risk that if all 2,000+ putative class members were to file individual lawsuits, different courts adjudicating those claims would reach different conclusions of law and findings of fact. And the BOP would be forced to adhere to different standards of conduct for each individual plaintiff based on the order of the court overseeing that plaintiff's litigation. However, this would not create "incompatible standards of conduct" for the

31

**Add.35**

BOP because the courts' orders would only be binding on the BOP as to the specific plaintiff in the litigation.

But contrary to the BOP's assertions, the PLRA does not dictate this outcome. Indeed, although § 3626(a)(1)(A) of the PLRA says that relief "shall extend no further than necessary to correct the violation of the Federal right of a *particular plaintiff or plaintiffs*," it goes on to say in § 3626(a)(2)—which governs preliminary injunctive relief—only that relief shall "extend no further than necessary" to correct the recognized harm. 18 U.S.C. § 3626(a)(1)(A), (2). Section 3626(a)(2) conspicuously omits the "particular plaintiff or plaintiffs" language. In any event, the Supreme Court has found that even when the language does apply, it does not operate to bar classwide relief if such relief is appropriate to satisfy the "particular plaintiff or plaintiffs" limitation. *Brown v. Plata*, 563 U.S. 493, 531–32 (2011).

Nevertheless, it is axiomatic that even outside the prison litigation context, a district court's orders are only binding on the parties to the lawsuit. Therefore, the plaintiffs' arguments to the contrary are unavailing.

### 2. Rule 23(b)(1)(B)

Rule 23(b)(1)(B) counsels class certification where "adjudications with respect to individual class members . . . would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). The plaintiffs cite three district court cases where Rule 23(b)(1)(B) has been successfully invoked in actions by inmates challenging the conditions of their confinement. Mot. for Class Certification at 11–12. And they further argue that in the absence of class certification, "the ability of future plaintiffs to challenge" the BOP's policy will be inhibited "under *stare decisis*." *Id.* at 12. But the force exerted by any decision of a district court on its

32

**Add.36**

sister district courts is at best persuasive. The plaintiffs cite *Riley v. Nev. Sup. Court* for the proposition that a decision made by a district court creates binding precedent on future district courts. *Id.* (citing 763 F. Supp 446, 453 (D. Nev. 1991)). But the plaintiffs' reading of that case is overbroad. The court there only said that if a subsequent plaintiff were to raise the same claims as those the court had already found foreclosed *in front of that* "particular court," then *stare decisis* would bind the subsequent plaintiff. While the Court does not endorse this reasoning, even taken at face value it cannot support the heavy weight the plaintiffs try to place on it.

### 3.  Rule 23(b)(2)

The plaintiffs' quest for class certification finally arrives at Rule 23(b)(2), which requires that the party opposing certification has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Injunctive relief must be "indivisible" in these cases, meaning that the relief for any individual plaintiff can only be obtained if the court enjoins the actions of the opposing party "as to all of the class members." *Wal-Mart*, 564 U.S. at 360. Because they challenge the Executive Order and BOP implementing memoranda, and because they seek only to enjoin those actions, the plaintiffs argue that the relief they seek would resolve their claims "in one stroke." Mot. for Class Certification at 13 (citing *Wal-Mart*, 564 U.S. at 350). The Court agrees. Enjoining the BOP implementing memoranda will provide swift, indivisible relief to all plaintiffs during the pendency of this litigation.

To avoid this conclusion, the defendants devote most of their Rule 23(b)(1)(B) discussion to the plaintiffs' failure to satisfy a "presumption of cohesiveness" with respect to their Eighth Amendment claims. Defs.' Opp'n 30–31 (citing *Borum v. Brentwood Vill., LLC*, 324 F.R.D. 1, 19 (D.D.C. 2018) (citations omitted)). They further argue that the BOP has not acted on grounds that

generally apply to the entire class, but instead has conducted "individualized assessments to address the medical needs of inmates in its custody." *Id.* at 31. But this argument fails for at least two reasons. First, the plaintiffs have provided declarations showing that BOP officials terminated hormone therapy treatments for them and other inmates in direct response to the Executive Order. Rather than reflecting an "individualized assessment," this comprehensive, blanket policy to end hormone therapy is the exact type of "generally applicable" policy that a Rule 23(b)(2) class action can properly seek to enjoin. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 182 (D.D.C. 2015) (citing Fed. R. Civ. P. 23(b)(2)).

Second, even if the BOP officials' actions over the last several months did amount to making medical assessments as to each plaintiff, it is clear to this Court that all of those assessments are being made with the full information of the Executive Order, implementing memoranda, and the Court's rulings in this case and *McHenry* in mind. As Ms. Kingdom says, she and nine other plaintiffs had access to their hormone therapy restored by a BOP medical official who explicitly referred to this litigation when meeting with them. Suppl. Kingdom Decl. ¶¶ 1–2. And Mr. Kapule indicates that his hormone therapy will end as soon as his prescription expires, which hardly seems like the type of medical decision that was made after an "individualized assessment." Suppl. Kapule Decl. ¶ 3. Therefore, to the extent the BOP officials have been meeting with the plaintiffs about their medical needs, none of the assessments made by those officials can be said to have been "individualized."

For the foregoing reasons, the Court finds that the plaintiffs' claims can properly be certified under Rule 23(b)(2).

## VII.    THE PRESIDENT WILL NOT BE DISMISSED AS A DEFENDANT FROM THIS LITIGATION

The defendants argue that the President should be dismissed as a defendant because he is immune from injunctive relief. *See* Defs.' Opp'n 34. The plaintiffs respond that, even though they do not seek to enjoin the President, declaratory relief against the President is still available. Preliminary Injunction Reply 25. At least in this early stage of the litigation, and with thin minimal briefing from the parties on this matter, the Court agrees with the plaintiffs.

"In contrast to the case law concerning injunctive relief against the president, the Court notes the lack of clear authority on the availability of declaratory relief against a sitting president." *Missouri v. Biden*, 662 F. Supp. 3d 626, 682 (W.D. La. 2023). Courts in this District, and the D.C. Circuit, have previously affirmed the issuance of declaratory relief involving the President. *See Harris v. Bessent*, No. 25-cv-412 (RC), 2025 WL 679303, at *9 (D.D.C. Mar. 4, 2025) (entering declaratory judgment against the President given the plaintiff's "strong claim for relief under established standards") (internal citations omitted); *see also Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (considering declaratory judgment to be a less drastic remedy than a writ of mandamus); *Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that the President's actions under Line Item Veto Act were invalid). But the Court also observes that on other occasions, courts have dismissed the President as a defendant when doing so would have "no substantive effect on the outcome" of the case, *see Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 253 (S.D.N.Y. 2020), and have construed the availability of declaratory relief against the President narrowly, *see New Mexico v. Musk*, No. 25-cv-429 (TSC), 2025 WL 1502747, at *19 (D.D.C. May 27, 2025). Facing this ambiguous landscape, the Court declines to dismiss President Trump as a defendant at this early juncture, without prejudice to later dismissal.

**Add.39**

## VIII.    CONCLUSION

During the pendency of this litigation, the BOP is required to restore and maintain access to those treatment modalities for those who previously received them pursuant to a prescription rendered by BOP staff. And moreover, if BOP medical personnel subsequently determine that an existing or future class member is in need of either or both of these treatment modalities, the BOP may not take those treatment options off the table while this dispute is pending.

The import of the Opinion is essentially this: Under the APA, the BOP may not arbitrarily deprive inmates of medications or other lifestyle accommodations that its own medical staff have deemed to be medically appropriate without considering the implications of that decision. Even if the BOP *did* support such a decision with the consideration, study, and reasoning that the APA requires of it, its freedom of action may nevertheless be constrained by the Eighth Amendment of the Constitution, but that is a matter better left for another day—whether that be a later stage of litigation, or another case entirely.

For the foregoing reasons, the plaintiffs' Motion for a Preliminary Injunction will be **GRANTED**, and their Motion for Class Certification will likewise be **GRANTED**. A separate Order consistent with this Opinion shall issue.

Date:  _Jun. 3, 2025_

Royce C. Lamberth
United States District Judge

36